**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X    **Case No.**
ELENA BEKKER,

                     Plaintiff,                        **COMPLAINT**

         - against -

MACY'S RETAIL HOLDINGS, INC.,           **PLAINTIFF DEMANDS**
                                            **A TRIAL BY JURY**

                     Defendant.
-------------------------------------------------------------------X

       ELENA BEKKER ("Plaintiff"), by and through her attorneys, PHILLIPS &

ASSOCIATES, PLLC, against MACY'S RETAIL HOLDINGS, INC., ("Defendant"), alleges

upon knowledge as to herself and her own actions and upon information and belief as to all other

matters as follows:

<u>**NATURE OF THE CASE**</u>

1.     Plaintiff complains pursuant to the discrimination and retaliation provisions of (i) **Title VII of**

     **the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000e, *et. seq.* ("Title VII");  (ii) the

     **New York State Human Rights Law**, New York State Executive Law, § 296 *et seq.*

     ("NYSHRL"); (iii) the **New York City Human Rights Law,** New York City Administrative

     Code § 8-107(1), <u>et</u> <u>seq</u>. ("NYCHRL"), and any other claim(s) that can be inferred from the

     facts set forth herein and seeks damages to redress the injuries Plaintiff suffered as a result of

     being discriminated against and retaliated against by Defendant on the **basis of Plaintiff's**

     **National Origin (Russian) and Religion/Creed (Jewish).**

<u>**JURISDICTION AND VENUE**</u>

2.     Jurisdiction of this Court is proper under 42 <u>U.S.C.</u> §12101, et seq., and 28 <u>U.S.C.</u> §§ 1331

and 1343.

3.    The Court has supplemental jurisdiction over Plaintiff's state and county claims pursuant to 28 U.S.C. § 1367.

4.    Venue is proper in this district in that the events or omissions giving rise to the claims occurred within the Southern District of New York. 28 U.S.C. § 1391(b).

## PROCEDURAL PREREQUISITES

5.    Plaintiff timely filed a complaint, upon which this Complaint is based, with the United States Equal Employment Opportunity Commission ("EEOC").

6.    Plaintiff received a Notice of Right to Sue from the EEOC dated November 2, 2022, with respect to the instant charges of discrimination. A copy of the Notice is annexed to this Complaint.

7.    This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

## PARTIES

8.    At all times material, Plaintiff was and is a Jewish woman of Russian national origin, and a resident of the State of New York.

9.    At all times material, Plaintiff was and is a "person" and an "employee" of Defendant and entitled to protection as defined by TITLE VII, NYSHRL, and NYCHRL.

10.   At all times material, MACY'S RETAIL HOLDINGS, INC., ("Defendant") was and is a domestic and national department store, with headquartered at 151 W 34th St, New York, New York 10001.

11.   At all times material, Plaintiff was employed in Defendant's Herald Square location, located at 151 W 34th St., New York, NY 10001 ("Herald Square Location").

12.   At all times material, Plaintiff was employed by Defendant.

13.    At all relevant times herein, Defendant "employs" fifteen or more "employees," and is thus an "employer" within the meaning of Title VII, Section 1981, the NYSHRL, and the NYCHRL.

14.    At all times material, Defendant was an "employer" under TITLE VII, NYSHRL, and NYCHRL.

## **MATERIAL FACTS**

15.    In or about May 2018, Plaintiff began working for Defendant as a part-time freelancer for Lancôme events earning approximately $18.00 per hour.

16.    At the time of Plaintiff's hire, Defendant had ten freelance employees and only two permanent positions available.

17.    Shortly after Plaintiff's hire, Plaintiff completed various successful Lancôme events and showed outstanding sales performance. In fact, of the ten freelancers Plaintiff proved to be the best salesperson of the group.

18.    As such, in or around May 2018, Manager Abbie Billini ("Ms. Billini"), hired Plaintiff as a permanent part-time Lancôme Representative, earning $20.00 per hour.

19.    At all times relevant herein, Plaintiff worked approximately 28-32 hours per week.

20.    Immediately upon offering Plaintiff the job, Ms. Billini told Plaintiff at least three times, "you don't have to take this job."

21.    Plaintiff found Ms. Billini's statement to be strange and alarming. Nevertheless, excited for the opportunity of a permanent position with Defendant, Plaintiff accepted the position.

22.    At all times material, Plaintiff was qualified for her position as a sales associate.

23.    At all times material, Plaintiff's performance met or exceeded the Defendants' expectations. Indeed, Plaintiff was an exemplary employee with documented success in her sales and proven dedication to Defendant.

24. Upon information and belief, Plaintiff was the only Russian sales associate working at the Lancôme counter at Defendant's Herald Square location.

25. Plaintiff's native language is Russian.

26. Despite English not being Plaintiff's native language, Plaintiff was able to converse and interact with customers in a friendly manner. In fact, many customers regularly sought Plaintiff's assistance at Defendant's Herald Square Location for her exceptional customer service skills.

27. At all times material, Plaintiff worked under the supervision of Lancôme Executive Manager Melissa Fassett ("Ms. Fassett"), Counter Manager Fallon Fonrose ("Ms. Fonrose"), and Ms. Billini.

28. Upon information and belief, Ms. Fassett is a Hispanic Female.

29. Upon information and belief, Ms. Fonrose is a Trinidadian Female.

30. Throughout Plaintiff's tenure with Defendant, Plaintiff was subjected to an unconscionable campaign of harassment and discrimination based on Plaintiff's National Origin (Russian) and Religion (Jewish). Notably, Plaintiff was regularly targeted by her co-workers with the acquiescence of Defendant's Management, because despite Plaintiff's language barrier, she consistently outperformed the sales metrics of her non-Russian co-workers.

31. In or around October 2019, Plaintiff asked the Business Manager Shaila (last name unknown) ("Ms. Shaila"), for a new schedule. Specifically, Plaintiff informed Ms. Shaila that former employee Amer Bukhary ("Mr. Bukhary") had resigned, and as such Plaintiff wanted to move onto his schedule which was a 36–40-hour schedule per week, as opposed to Plaintiff's 28–32-hour schedule.

32. Upon information and belief, Ms. Shaila is a Hispanic Female.

33.   At first, Ms. Shaila refused, but ultimately agreed after Plaintiff pled her need for more hours and noted her seniority.

34.   In or around October 2019, Ms. Shaila issued Plaintiff a $1 per hour raise by submitting documentation to HR. However, Ms. Shaila specifically told Plaintiff to not tell Ms. Fassett about the raise.

35.   In or around November 2019, Defendant hired Janet Peters ("Ms. Peters"). Ms. Peters was then assigned to work on the 4th Floor Lancôme counter with Plaintiff.

36.   Upon information and belief, Ms. Peters is an Italian American female.

37.   In or around November 2019, Defendant also hired Nireida Rodriguez ("Ms. Rodriguez") as a part-time Lancôme Representative.

38.   Upon information and belief, Ms. Rodriguez is a Hispanic Female.

39.   Shortly after Ms. Rodriguez's hire, Ms. Rodriguez informed Plaintiff that Ms. Rodriguez was earning $24.00 per hour. In contrast, Plaintiff was only earning $21.95 after working for Defendant for over a year. Moreover, when Plaintiff was initial hired, Plaintiff's salary was only $20.00 per hour, $4.00 less per hour than her non-Russian counterpart.

40.   On or about January 20, 2020, at approximately 5:30 P.M. ("January 20th Comment"), Plaintiff was working with a client, Ms. Fatma Kaskar ("Ms. Kaskar"), when Ms. Peters approached Plaintiff in front of the client and stated, "you have five times more sales than me, so it's enough reason for me to get this sale."

41.   Upon information and belief, Ms. Peters January 20th Comment was intended to undermine and embarrass Plaintiff due to Plaintiff's identity as a Russian woman. Moreover, as a result Ms. Peters intended to undercut and poach Plaintiff's sales.

42.   Plaintiff refused to give Ms. Peters the sale. Immediately after completing the sale, Plaintiff

informed Counter Manager Shanequa Matthews ("Ms. Matthews") of Ms. Peter's inappropriate and aggressive actions.

43. On or about January 22, 2020, Ms. Shaila called a meeting with Ms. Peters and Plaintiff to address Ms. Peters January 20th Comment. As a result, Ms. Peters apologized to Plaintiff.

44. Upon information and belief, Ms. Shaila did not report Ms. Peters' January 20th Comment to HR.

45. On or about February 7, 2020, the customer, Ms. Ms. Kaskar, returned to the store to pick up her pre-sale item. While Plaintiff assisted Ms. Kaskar, Ms. Peters seemed visibly annoyed and treated Plaintiff with hostility and animosity. So much so that Ms. Fatma Kaskar then asked to speak to a manager to complain about the attitude Ms. Peters was giving Plaintiff. As a result, Ms. Kaskar verbally complained to former counter manager, Kim Hanyang ("Ms. Hanyang") about Ms. Peters' inappropriate behavior towards Plaintiff, to no avail.

46. Upon information and belief, Ms. Hanyang and Plaintiff escalated Ms. Kaskar's complaint to Ms. Fonrose, to no avail.

47. On or about February 18, 2020,  Ms. Fonrose, told Plaintiff that Plaintiff must share her sales with Ms. Peters. Plaintiff disagreed, and explained it was unprofessional to make such a demand in Ms. Peters' presence. Plaintiff further reminded Ms. Fonrose of Ms. Peter's incident a few months earlier where she tried to force a customer away from Plaintiff.

48. Suddenly, Ms. Peters became irate and began screaming at Plaintiff, "I'm tired of your stories" and then threatened, "I'll get a lawyer, HR, and Union, and remove you from Macys."

49. On or about February 21, 2020, Plaintiff submitted a written complaint to Business Manager, Ms. Shaila, and explained the history of harassment, discrimination, and hostility that had occurred while Plaintiff worked for Defendant. Specifically, Plaintiff noted Ms. Peters and Ms.

Fonrose's hostility, harassment, and discrimination.

50.     On or about July 14, 2020, Plaintiff noticed Ms. Peters was not wearing a mask, despite COVID-19 Protocols ordering employees to wear masks in accordance with the CDC, NYS Laws, and Defendant's policies.  Plaintiff then asked Ms. Peters to please put on a mask. Ms. Peters refused, and then ran to Ms. Fonrose to complain that Plaintiff was being "rude." Plaintiff adamantly denied Ms. Peter's allegations, but Ms. Fonrose refused to listen to Plaintiff's concerns and summarily sided with Ms. Peters.

51.     Plaintiff then asked Lancôme Operations Manager Ms. Kimberly Vinueza ("Ms. Vinueza") to intervene. Ms. Vinueza then ordered Ms. Peters to follow the rules and wear a mask.

52.     In or around Mid July 2020, Plaintiff met with Education Lancôme Manager Ciara Williams ("Ms. Williams") to request a pay raise due to Plaintiff's outstanding sales record. Ms. Williams denied Plaintiff's request and claimed Defendant "does not have money" to issue raises and told Plaintiff, "You're getting good commissions."

53.     Only a few days later, Plaintiff learned that a co-worker Ranita Moonsawmy ("Ms. Moonsawmy"), a Guyanese female, had been issued a raise only days earlier. Notably, Ms. Moonsawmy worked in the same position as Plaintiff but had less hours and less sales than Plaintiff.

54.     In or around July 2020, Plaintiff purchased clothing from Defendant. Ms. Peters rang up Plaintiff's order.

55.     Upon information and belief, Defendant does not offer commission on clothing sales.

56.     On or about July 27, 2020, following proper policies and protocols, Plaintiff returned the clothing items she no longer wanted. Ms. Peters learned of Plaintiff's return and wrongfully accused Plaintiff of creating a "negative balance" on Ms. Peter's commissions account.

Plaintiff attempted to explain that the clothing sales do not create commission, therefore the returns could not have affected Ms. Peter's commissions balance. In response, Ms. Peters was furious and continued to treat Plaintiff with hostility.

57.    On or about August 3, 2020, Defendant scheduled a meeting with the Store Manager of the Cosmetics Department, Veneta (last name unknown) ("Ms. Veneta"), and Ms. Peters. The meeting was scheduled to discuss Ms. Peters hostile behavior towards Plaintiff. Plaintiff attempted to explain the hostility, harassment, and discrimination Plaintiff was facing, to no avail.

58.    Upon information and belief, the number of credit cards each salesperson opens for Defendant is a metric used to measure the success of each salesperson. Furthermore, salespeople derive commission and recognition based on the number of cards opened.

59.    On various occasions, Defendant's Management tried to undermine Plaintiff's metrics and opportunities to earn commissions and incentives. To wit, on or about August 12, 2020, Plaintiff successfully convinced a customer to open a store credit card. Ms. Fonrose interrupted the sale and in front of the customer, asked Plaintiff to give the sale and the opened store credit card to Ms. Peters. Ms. Fonrose then explained to Plaintiff that Ms. Peters was not making sales and claimed Plaintiff should share her sales.

60.    Upon information and belief, Ms. Fonrose never made efforts to undermine the metrics of her non-Russian supervisees.

61.    As such, Plaintiff refused to give her sale to Ms. Peters, and completed the sale herself.

62.    Ms. Fonrose then spent the next fifteen minutes berating Plaintiff and accusing Plaintiff of being a "bad team player."

63.    On or about August 13, 2020, Plaintiff asked Ms. Williams to schedule a meeting with Ms.

8

Fonrose and Plaintiff regarding Ms. Fonrose's behavior. Specifically, Plaintiff further notified Ms. Williams of Ms. Fonrose's attempt to force Plaintiff to give away commission sales to Ms. Peters.

64. That same day, Ms. Williams held a meeting with Ms. Fonrose and Plaintiff. During the meeting, Ms. Fonrose and Ms. Williams both accused Plaintiff of being a "bad team player" and criticized Plaintiff for keeping her commission sales.

65. Following Plaintiff's complaint to Ms. Williams of harassment and discrimination, Defendant, through its managers, began retaliating against Plaintiff. By way of example, immediately after Plaintiff's complaints of harassment and discrimination, Ms. Williams and Ms. Fonrose refused to acknowledge or praise Plaintiff's excellent performance and steady sales. However, in stark contrast, they routinely sent group chat messages praising other non-Russian and non-Jewish employees for work well-done.

66. On or about September 28, 2020, a customer arrived at the Lancôme counter and asked Plaintiff to help her purchase an eyebrow pencil. Once again, Ms. Peters rudely interrupted the sale and asked Plaintiff to give her the sale claiming Ms. Peters had not sold anything that day. Plaintiff refused because of Ms. Peters' hostile tone, because the customer had specifically requeted Plaintiff's service, and because of Ms. Peters' unprofessional approach. Ms. Peters then called Ms. Fonrose to complain again that Plaintiff made another sale.

67. Later that day, Ms. Fonrose called another meeting with Ms. Peters and Plaintiff. Ms. Fonrose then told Plaintiff she must share her sales with Ms. Peters. In response, Plaintiff objected. Ms. Peters became irate and once again threatened Plaintiff claiming she would obtain a lawyer and "get [Plaintiff] out of Macys." Ms. Fonrose observed Ms. Petters' threats but did not intervene.

68.     In or around late September 2020, Ms. Williams informed Plaintiff there would be a meeting with the Store Manager, and that Plaintiff would be asked to sign a document regarding Plaintiff's discipline. Plaintiff asked why she was being disciplined noting that she had done nothing wrong. In fact, Plaintiff further noted that Ms. Peters should be the person reprimanded for her unprofessional and hostile conduct. Plaintiff received no reply and was issued a formal write-up.

69.     In or about early October 2020, Plaintiff contacted Human Resources Representative Debbie (last name unknown) ("Ms. Debbie"), and filed a formal complaint of harassment, discrimination, hostile work environment, and retaliation. Plaintiff further cited to Management's repeated attempts to pressure Plaintiff into giving away commission sales.

70.     In or around October 2020, Ms. Veneta, and Cosmetics Store Manager Carla (last name unknown) ("Ms. Carla"), met with Plaintiff and claimed they were aware that Plaintiff spoke with Ms. Debbie from HR, and wanted to find a solution. They then asked Plaintiff, "what would you like us to do?"

71.     When the meeting concluded, Ms. Veneta and Ms. Carla came to the conclusion that the "solution" would be that Plaintiff would not have to speak with Ms. Peters at all. However, this was an unreasonable solution that would only cause more hostility as Plaintiff would still be obligated to work with Ms. Peters behind the same counter.

72.     On or about November 21, 2020, while working on the first floor, Plaintiff learned Ms. Fonrose had "warned" the first-floor employees that Plaintiff was "a very sensitive person and will complain about every other thing."

73.     Plaintiff was shocked and offended by Ms. Fallon's unsolicited and offensive comments regarding her formal complaint of discrimination.

74. On or about January 21, 2021, Plaintiff attended a virtual Lancôme training session. During the virtual training Plaintiff was noted to be the number one salesperson for Lancôme. Defendant then issued complimentary gifts to the employees thanking them for their hard work. However, despite Plaintiff's outstanding sales, Defendant inexplicably issued Plaintiff a gift of substantially less value than what her non-Russian and non-Jewish co-workers received.

75. On or about February 3, 2021, Ms. Williams told Plaintiff she had earned a gratis gift due to her outstanding presale sales. Plaintiff was excited to be recognized for her hard work. However, multiple weeks went by, and Ms. Williams repeatedly failed to issue Plaintiff her complimentary gift continuously citing pretextual reasons such as a broken printer.

76. Upon information and belief, Ms. Williams did not want to provide Plaintiff with her complimentary gift due to Plaintiff's outstanding presale sales metrics to avoid acknowledging Plaintiff's hard work and efforts.

77. On or about February 5, 2021, Plaintiff asked Ms. Fonrose to hold a small meeting regarding counter cleanliness so that all employees could be on the same page. Ms. Fonrose immediately attempted to instigate a problem and claimed, "do you mean that [Ms. Peters] doesn't clean here?"

78. Plaintiff explained, that was not what she meant, and that Plaintiff only wanted all employees to have the same expectation for the countertops.  Ms. Fonrose then yelled at Plaintiff that what Plaintiff said regarding Ms. Peters not cleaning was unprofessional and could "break the relationship with your coworker."

79. Notably, Plaintiff never claimed Ms. Peters did not clean, and Ms. Fonrose only yelled this to create further animosity between Plaintiff and Ms. Peters.

80. Nevertheless, Ms. Fonrose then claimed she would do a short meeting about the countertops.

As Ms. Fonrose started the meeting, Plaintiff's phone chimed, and Plaintiff excused herself to check the message quickly and explained it was likely her customer waiting on an order. Ms. Fonrose then became irate and yelled at Plaintiff claiming Plaintiff was being "rude."

81.    On or about February 6, 2021, Plaintiff was working with a customer and attempting to finish a sale.  Ms. Peters purposely treated Plaintiff with hostility and animosity while Plaintiff was attempting to complete the sale in an effort to undermine her in front of the customer and steal the sale.

82.    Later that day, Plaintiff complained to Ms. Fonrose of Ms. Peters' hostility and attitude, especially while in front of customers. Ms. Fonrose did not intervene, did not escalate the complaint, and did not discipline Ms. Peters. In fact, Ms. Fonrose seemed uninterested in Plaintiff's complaints.

83.    On or about February 8, 2021, Plaintiff returned from lunch to find Ms. Peters working on a transaction with a Russian customer that Plaintiff usually serves.  When the customer saw Plaintiff approaching the counter she said, in Russian, "I didn't know you were here." Plaintiff replied, in Russian, "its Ok, I was on lunch, I hope you were served well." The client replied, in Russian, "I would like to give you the sale" and Plaintiff replied, "we are not going to return and rebuy." However, the words "return" and "rebuy" were said in English.

84.    Ms. Peters heard the two English words and accused Plaintiff of attempting to steal her sale. Plaintiff tried to explain that Ms. Peters misunderstood, and that the sale was already complete.

85.    The customer left and Ms. Peters continued to harass Plaintiff claiming, "you are always making all of the sales."

86.    During the conversation, Ms. Matthews, who arrived at the Lancôme counter to grab something, noticed the conversation, and asked if there was a problem. Plaintiff explained she

had no problem, and Ms. Peters lied and told Ms. Matthews that Plaintiff tried to steal her sale.

87. Plaintiff attempted to explain what had occurred and that the conversation was in Russian, but Ms. Peters would not allow Plaintiff to speak. Ms. Peters then screamed at Plaintiff "why are you smiling?" Plaintiff was shocked at the accusation, and even Ms. Matthews asked, "how can you tell she's smiling? She's wearing a mask." Ms. Peters continued screaming, and Ms. Matthews ordered Ms. Peters to go downstairs.

88. Twenty minutes later, Ms. Williams came upstairs with Ms. Peters. Then, Ms. Williams told Plaintiff it was "very unprofessional to yell on the floor" and that Ms. Williams would "have to let HR know." Plaintiff attempted to explain she did not yell at all, and that Ms. Peters had instigated the situation, but Ms. Williams ignored Plaintiff.

89. Notably, Ms. Peters had screamed at Plaintiff countless times while on the sales floor in the presence of Defendant's Management without consequence.

90. On or about February 10, 2021, Ms. Williams, and Store Manager Ms. Shaila, called a meeting with Plaintiff and claimed Plaintiff had poor behavior, and that she would be written up to HR. Ms. Shaila further threatened Plaintiff could be terminated. Both Ms. Shaila and Ms. Williams were extremely hostile towards Plaintiff, and Plaintiff felt the meeting was unfair as she did not attempt to take Ms. Peters sale and did not yell, yet Plaintiff was being wrongfully accused.

91. The following day, Plaintiff complained to Human Resources of Ms. Williams and Ms. Shaila's hostility, animosity, and retaliation. Further, Plaintiff gave a detailed explanation as to the events that occurred on February 8, 2021, and Management's reaction.

92. On or about February 21, 2021, HR Representative, Ms. Jena, called Plaintiff and claimed everything had been investigated and resolved.

93. On or about March 11, 2021, Ms. Williams called Plaintiff into the office and gave Plaintiff

free items, including a free Lancôme Perfume Idol. Ms. Williams claimed the gifts were due to Plaintiff's great performance.

94.    On or about March 12, 2021, Ms. Williams, Ms. Vinueza, and Manager Xiomara (last name unknown) ("Ms. Xiomara") called Plaintiff into the office and attempted to force Plaintiff into signing a disciplinary document based on the events of February 8, 2021. Notably, the events of February 8, 2021, had allegedly already been resolved as per HR. Nevertheless, Ms. Williams insisted Plaintiff sign a disciplinary document claiming Plaintiff had acted inappropriately.

95.    Plaintiff asked for time to read the document before signing because Plaintiff did not understand what the document stated, and that to the extent she could understand it, it contained inaccurate depictions of what had occurred. Ms. Williams refused to allow Plaintiff time to read and pressured Plaintiff to sign.

96.    Later that same day, Plaintiff took the document home and asked Plaintiff's daughters to translate the disciplinary action. Plaintiff was shocked to hear the false and inappropriate allegations listed in the disciplinary action.

97.    That same night, Plaintiff emailed Ms. Williams expressing her confusion as to the document, summarizing what had occurred, and asking how to appeal the disciplinary action. Plaintiff received no response.

98.    On or about March 15, 2021, Plaintiff submitted a second complaint to HR regarding the ongoing harassment, discrimination, and hostile work environment. Specifically, Plaintiff recounted the events that occurred on March 12, 2021, and complained of harassment, discrimination, feeling forced to sign a false document, and feeling pressured by management to agree to a false narrative. Plaintiff further explained how Ms. Williams humiliated Plaintiff

by standing above Plaintiff in an intimidating manner, and then purposely reading the disciplinary action aloud, in front of various other managers. Plaintiff further explained Ms. Williams pressured and demanded Plaintiff immediately sign the document, despite Plaintiff requesting more time to read and understand the accusations. Plaintiff ended the letter by asking HR to investigate the matter and to remove the retaliatory final warning on Plaintiff's file.

99.   On or about March 21, 2021, at approximately 11:00 A.M., Plaintiff arrived to work and saw Ms. Fonrose. Plaintiff was very excited to share that the previous day Plaintiff had sold two credit cards. Ms. Fonrose replied in an aggressive tone that Plaintiff was doing it for her own good, and that Ms. Fonrose didn't need to praise her for it. Ms. Fonrose then claimed, "I opened three credit cards two days ago, but I didn't tell you about it." Plaintiff was shocked and upset and replied that she was only telling Ms. Fonrose because Ms. Fonrose is her manager.

100.   On or about March 21, 2021, at approximately 1:00 P.M., Ms. Fonrose asked Plaintiff if the stock man had restocked the "Clarifique Dual Essence" the day prior. Plaintiff replied, "nobody told me about it." Ms. Fonrose then became unreasonably upset and said, "stop saying it, the meaning "nobody told me" means that Ms. Vinueza and Sharonda are bad managers and makes them look bad."

101.   Plaintiff apologized and said, "you asked me a question and I answered you, why are you analyzing my answer so much?" Ms. Fonrose then continued to berate Plaintiff and for ten minutes criticized Plaintiff for her choice of words. Plaintiff then apologized and said, "Ok, what is your expectation for this question? I would like to know for next time to avoid the problems". Ms. Fonrose replied, "What? If I will tell you what to answer you will follow it?" and Plaintiff replied, "yes of course." Ms. Fonrose then said, "I apologize if I made you upset,

15

but we are so different I am not going to tell you what is my expectation."

102. Later that same day, at approximately 5:40 P.M., Ms. Fonrose called Plaintiff's cellphone and ordered Plaintiff to throw out the coffee that Ms. Fonrose had left on the counter. Plaintiff did so but felt it was a form of bullying and intimidation.

103. Plaintiff therein realized Ms. Fonrose had become increasingly more aggressive and hostile with Plaintiff. Indeed, Ms. Fonrose was retaliating against Plaintiff and encouraging Plaintiff's termination or resignation.

104. Later that same day Plaintiff complained to Ms. Vinueza of Ms. Fonrose's aggressive behavior and inappropriate tone.

105. On or about March 22, 2021, Plaintiff spoke with Ms. Williams about Ms. Fonrose's ongoing retaliation and hostility and asked if Ms. Fonrose knew about Plaintiff's final warning. Ms. Williams did not answer, and only claimed it was private. Ms. Williams then claimed Ms. Fonrose's behavior was inappropriate and that Ms. Williams would speak with her.

106. Ms. Williams then told Plaintiff she would not be receiving another raise and that Plaintiff's raise request was denied by Ms. Fassett.

107. Plaintiff was shocked that her raise had been denied, again, despite Plaintiff's top sales. Plaintiff therein understood Management was retaliating against Plaintiff due to Plaintiff's multiple complaints of harassment and discrimination.

108. On or about March 23, 2021, Plaintiff met with her union representative Felix Ocasio ("Mr. Ocasio") regarding the unequal treatment and sought to challenge the disciplinary actions of Defendant. However, Mr. Ocasio informed Plaintiff there was nothing the Union could do. Plaintiff requested to file a grievance, but Mr. Ocasio refused.

109. On or about April 9, 2021, Plaintiff met with Ms. Vinueza and Ms. Williams regarding

Plaintiff's annual review. Plaintiff's review showed very high level of sales, customer service and opened credit cards, however Plaintiff received a very low rating for trust-building, a subjective category. Plaintiff asked why her score was so low, and Management blamed the 2020 complaints regarding Ms. Peters.

110.   In or about June 2021, Plaintiff requested to take a partial day off using PTO. Ms. Vinueza claimed Plaintiff could not take a partial day off and must take the entire day. Ms. Vinueza claimed this rule applied to all employees. Nevertheless, on or about June 20, 2021, Ms. Fonrose was permitted to take a partial day off. Similarly, Ms. Fonrose was permitted to take a partial day off on August 23, 2021. However, Plaintiff, the only Russian Jewish employee, was the only employee not permitted to take a half day.

111.   On or about June 11, 2021, Plaintiff complained to Ms. Vinueza and Ms. Williams regarding the unequal treatment regarding partial PTO. Plaintiff reiterated she wanted to use a partial PTO day for religious observances of Rosh Hashanah. Further, Plaintiff noted she had originally requested September 6, September 7, and September 8, 2021, off for the Jewish Rosh Hashanah holiday, but that all three days were denied. Ms. Vinueza then claimed employees were not permitted to take off three days in a row.

112.   Ms. Vinueza then claimed she would speak to HR to see if Plaintiff's religious holidays could be accommodated. Plaintiff followed up with Ms. Vinueza various times over the following two months and did not receive a response as to her holiday request.

113.   On or about August 8, 2021, Plaintiff attempted to restart a work computer in order to fix the computer's connectivity issues. As Plaintiff was restarting the computer, Ms. Fonrose forcefully grabbed Plaintiff by the wrist and ordered Plaintiff to not to restart the computer in an aggressive tone.

17

114.   Plaintiff then asked Ms. Fonrose if Defendant does not allow computers to be restarted, and Ms. Fonrose replied in an angry tone, Defendant does not prohibit restarting computers. Plaintiff completed the restart and corrected the technical issue.

115.   Plaintiff was left feeling shocked and shaken by Ms. Fonrose's inappropriate physical assault. Plaintiff then complained to Ms. Williams regarding Ms. Fonrose's inappropriate contact. Ms. Williams responded telling Plaintiff to speak with Ms. Fonrose herself and to tell Ms. Fonrose Plaintiff does not like being touched.

116.   Plaintiff was shocked that Management's response to a physical assault was to have Plaintiff address the person that assaulted her and to simply ask that it not happen again.

117.   Plaintiff asked Ms. Williams to address the matter, and informed Ms. Williams Plaintiff feared further retaliation from Ms. Fonrose. Nevertheless, Ms. Williams did not escalate the serious incident to Human Resources and did not discipline Ms. Fonrose.

118.   On or about August 12, 2021, two days after the assault, Management was finally made aware of Ms. Fonrose's assault on Plaintiff.

119.   Later that same day, Ms. Fonrose confronted Plaintiff and angrily complained that Plaintiff had alerted Management. Plaintiff felt very uncomfortable with confrontation and feared further retaliation.

120.   As such, Plaintiff informed Ms. Williams' of Ms. Fonrose's confrontation. As Plaintiff explained the confrontation, Ms. Vinueza was in the room and overheard the issue. Plaintiff therein informed Ms. Vinueza of the entire incident and explained how Ms. Fonrose had assaulted Plaintiff, and later how Ms. Fonrose confronted Plaintiff for telling Management.

121.   The following day Ms. Fonrose was demoted from Counter Manager to Beauty Advisor and was stationed on the first floor. Despite Ms. Fonrose's demotion, Ms. Fonrose was then placed

in the busiest Lancôme counter, thus allowing Ms. Fonrose to make a greater number of sales and greater commission.

122.    Notably, Ms. Fonrose was furious with Plaintiff, and continued to retaliate against Plaintiff by treating Plaintiff with hostility, animosity, and attempting to take Plaintiff's sales.

123.    For example, on or about August 17, 2021, Plaintiff used the computer to fill out a mandatory cultural survey that Plaintiff and all employees are obligated to fill out. While Plaintiff was completing the survey, Ms. Fonrose stood uncomfortably close to Plaintiff to read all of Plaintiff's responses. Plaintiff looked visibly uncomfortable, but Ms. Fonrose refused to move, and stood there as a form of bullying and intimidation.

124.    In or about December 2021, Defendant issued work calendars for December activities for employees to celebrate the holidays. Defendant incorrectly listed the Channukah dates and did not re-issue the calendar with corrected dates.

125.    In or about February 13, 2022, at approximately 4:00 A.M., Plaintiff received a text message from Ms. Williams. This caused Ms. Williams arrive late for work the following morning, and Ms. Williams took the opportunity to issue a tardy on Plaintiff's file, despite Ms. Williams being the reason why Plaintiff was late.

126.    On or about March 1, 2022, Plaintiff requested a copy of her annual performance review. Ms. Williams gave Plaintiff multiple excuses and claimed Plaintiff would not have it until April 2022.

127.    On or about March 15, 2022, Plaintiff asked Ms. Williams for a raise and cited to Plaintiff's outstanding sales performance. Ms. Williams immediately denied the raise, without giving any good faith consideration.

128.    On or about March 25, 2022, Ms. Williams further retaliated against Plaintiff by issuing

another pretextual and frivolous write up. Specifically, Plaintiff received a final warning disciplinary action based on the incidents of February 13, 2022. The final warning claimed Plaintiff was being disciplined as a result of arriving to work late on February 13, 2022, and then for "interrupting" Ms. Williams as Ms. Williams spoke.

129.   On or about March 26, 2022, Ms. Williams retaliated against Plaintiff again, by submitting yet another frivolous and pretextual write up. The final warning disciplinary write up was based on the events of March 15, 2022, in which Plaintiff requested a raise. Therein, Plaintiff realized Ms. Williams had retaliated against Plaintiff by taking the opportunity to create another frivolous write up claiming "inappropriate behavior."

130.   On or about December 5, 2022, Defendant terminated Plaintiff's employment citing her "behavior" as the grounds for her termination.

131.   Plaintiff engaged in protected activities by complaining to Management and Human Resources of the ongoing harassment, discrimination, and hostile work environment.

132.   To date, Defendant continues to harass and discriminate against Plaintiff on the basis of her national origin and religion.

133.   Further, Defendant has failed to properly investigate Plaintiff's multiple complaints of harassment, discrimination, and a hostile work environment and has failed to discipline any of the culpable parties.

134.   As a result of Defendant's actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, traumatized and emotionally distressed.

135.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain,

suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff

further experienced severe emotional and physical distress.

## FIRST CAUSE OF ACTION
### FOR NATIONAL ORIGIN DISCRIMINATION UNDER TITLE VII

136.   Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred

twenty-four.

137.   42 U.S.C. § 2000e-2(a)(1), states in part:

> It shall be an unlawful employment practice for an employer to fail
> or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to their
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin.

138.   As described herein, Defendant, through its employees, engaged in unlawful employment

practices prohibited by Title VII, by discriminating against Plaintiff on the basis of her national

origin (Russian) by creating, fostering, condoning, accepting, ratifying, and/or negligently

failing to prevent or remedy a hostile work environment that included, among other things,

discriminatory and disparate treatment of Plaintiff based on Plaintiff's national origin as a

Russian woman.

139.   As a result of Defendant's unlawful discriminatory conduct in violation of the Title VII,

Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an

award of monetary damages and other relief.

140.   As a result of the unlawful discriminatory conduct of the Defendant in violation of Title VII,

Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress,

including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss

of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is

entitled to an award of monetary damages and other relief.

141.    The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton

violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under

this statute and an award of punitive damages.

**SECOND CAUSE OF ACTION**
**FOR RELIGION DISCRIMINATION UNDER TITLE VII**

142.    Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred

thirty.

143.    42 U.S.C. § 2000e-2(a)(1), states in part:

> It shall be an unlawful employment practice for an employer to fail
> or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to their
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin.

144.    As described herein, Defendant, through its employees, engaged in unlawful employment

practices prohibited by Title VII, by discriminating against Plaintiff on the basis of her

religion/creed (Jewish) by creating, fostering, condoning, accepting, ratifying, and/or

negligently failing to prevent or remedy a hostile work environment that included, among other

things, discriminatory and disparate treatment of Plaintiff based on her religion/creed as a

Jewish woman.

145.    As a result of Defendant's unlawful discriminatory conduct in violation of the Title VII,

Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an

award of monetary damages and other relief.

146.    As a result of the unlawful discriminatory conduct of the Defendant in violation of Title VII,

Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress,

including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss

of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is

entitled to an award of monetary damages and other relief.

147.  The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton

violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under

this statute and an award of punitive damages.

### THIRD CAUSE OF ACTION
### FOR RETALIATION UNDER TITLE VII

148.  Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred

thirty-six.

149.  42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> [T]o . . . discriminate against any of his employees . . . because he
> has opposed any practice made an unlawful employment practice by
> this subchapter, or because he has made a charge, testified, assisted
> or participated in any manner in an investigation, proceeding, or
> hearing under this subchapter.

150.  As described herein, Plaintiff engaged in protected activities by complaining to Human

Resources and Management regarding Defendant's ongoing harassment and discrimination.

151.  As described herein, immediately after Plaintiff engaged in protected activities, Defendant

retaliated against Plaintiff by creating an even more adverse work environment and taking

adverse employment actions against Plaintiff.

152.  Defendant would not have retaliated against Plaintiff but for Plaintiff's objections and

complaints of harassment and discrimination.

153.  Such retaliatory treatment would dissuade any reasonable employee from making or

supporting a similar complaint of discrimination.

154.  As a result of Defendant's unlawful conduct in violation of the Title VII, Plaintiff has suffered,

and continues to suffer, economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

155. As a result of the unlawful conduct of Defendant in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

156. The unlawful discriminatory actions of Defendant constitutes malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## FOURTH CAUSE OF ACTION
## FOR NATIONAL ORIGIN DISCRIMINATION UNDER THE NYSHRL

157. Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred-forty-five.

158. New York State Executive Law §296(1)(a) provides that

> It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

159. As described herein, Defendant, through its employees, engaged in unlawful employment practices prohibited by NYSHRL by discriminating against Plaintiff on the basis of her national origin (Russian) by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of Plaintiff based on Plaintiff's national origin

as a Russian woman.

160. As a result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

161. As a result of the unlawful discriminatory conduct of the Defendant's in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

162. The unlawful discriminatory actions of Defendant's constitute malicious, willful, and wanton violations of NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**FOR RELIGION DISCRIMINATION UNDER THE NYSHRL**

163. Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred fifty-one

164. New York State Executive Law §296(1)(a) provides that

> It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

165. As described herein, Defendant, through its employees, engaged in unlawful employment practices prohibited by NYSHRL, by discriminating against Plaintiff on the basis of her religion/creed (Jewish) by creating, fostering, condoning, accepting, ratifying, and/or

negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of Plaintiff based on her religion/creed as a Jewish woman.

166.   As a result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

167.   As a result of the unlawful discriminatory conduct of the Defendant's in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

168.   The unlawful discriminatory actions of Defendant's constitute malicious, willful, and wanton violations of NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

### SIXTH CAUSE OF ACTION
### FOR RETALIATION UNDER THE NYSHRL

169.   Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred fifty-seven.

170.   Executive Law § 296 provides that:

> "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

171.   As described herein, Plaintiff engaged in protected activities by complaining to Human Resources and Management regarding Defendant's ongoing harassment and discrimination.

172.   As described herein, immediately after Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff by creating an even more adverse work environment and taking adverse employment actions against Plaintiff.

173.   Defendant would not have retaliated against Plaintiff but for Plaintiff's objections and complaints of harassment and discrimination.

174.   Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar complaint of discrimination.

175.   As a result of Defendant's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

176.   As a result of the unlawful conduct of the Defendant's in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

177.   The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## SEVENTH CAUSE OF ACTION
## FOR NATIONAL ORIGIN DISCRIMINATION UNDER THE NYCHRL

178.   Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred sixty-seven.

179.   New York City Administrative Code §8-107(1) provides that it shall be an unlawful discriminatory practice:

> For an employer or an employee or agent thereof, because of
> the actual or perceived age, race, creed, color, national
> origin, gender, disability, marital status, sexual orientation
> or alienage or citizenship status of any person, to refuse to
> hire or employ or to bar or to discharge from employment
> such person or to discriminate against such person in
> compensation or in terms, conditions, or privileges of
> employment.

180. As described herein, Defendant, through its employees, engaged in unlawful employment practices prohibited by NYSHRL by discriminating against Plaintiff on the basis of her national origin (Russian) by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of Plaintiff based on Plaintiff's national origin as a Russian woman.

181. As a result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

182. As a result of the unlawful discriminatory conduct of the Defendant's in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

183. The unlawful discriminatory actions of Defendant's constitute malicious, willful, and wanton violations of NYCHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## EIGHTH CAUSE OF ACTION
## FOR RELIGION DISCRIMINATION UNDER THE NYCHRL

184. Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred seventy-two.

185. New York City Administrative Code §8-107(1) provides that it shall be an unlawful discriminatory practice:

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment.

186. As described herein, Defendant, through its employees, engaged in unlawful employment practices prohibited by NYCHRL, by discriminating against Plaintiff on the basis of her religion/creed (Jewish) by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, discriminatory and disparate treatment of Plaintiff based on her religion/creed as a Jewish woman.

187. As a result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

188. As a result of the unlawful discriminatory conduct of the Defendant's in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is

entitled to an award of monetary damages and other relief.

189.   The unlawful discriminatory actions of Defendant's constitute malicious, willful, and wanton violations of NYCHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**NINTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE NYCHRL**

190.   Plaintiff repeats and realleges each and every allegation in paragraphs one through one hundred seventy-eight.

191.   The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

192.   As described herein, Plaintiff engaged in protected activities by complaining to Human Resources and Management regarding Defendant's ongoing harassment and discrimination.

193.   As described herein, immediately after Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff by creating an even more adverse work environment and taking adverse employment actions against Plaintiff.

194.   Defendant would not have retaliated against Plaintiff but for Plaintiff's objections and complaints of harassment and discrimination.

195.   Such retaliatory treatment would dissuade any reasonable employee from making or supporting a similar complaint of discrimination.

196.   As a result of Defendant's unlawful conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

197.   As a result of the unlawful conduct of Defendant in violation of NYCHRL, Plaintiff has

suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

198.    The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of NYCHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

199.    Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A.      Declaring that Defendant engaged in unlawful employment practices prohibited by Title VII, NYSHRL, and NYCHRL in that Defendant discriminated  and retaliated against Plaintiff on the basis of Plaintiff's national origin (Russian) and religion (Jewish), and created and maintained a hostile work environment;

B.      Declaring that Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court;

C.      Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

D.      Awarding Plaintiff compensatory damages for mental, emotional injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

E.      Awarding Plaintiff punitive damages;

F.      Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the

prosecution of the action; and

G.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy Defendant's unlawful employment practices.

Dated:  Garden City, New York
        December 14, 2022

                                        **PHILLIPS & ASSOCIATES,**
                                        **ATTORNEYS AT LAW, PLLC**

                            By:     _____/s/_____
                                        Marjorie Mesidor
                                        585 Stewart Avenue, Suite 430
                                        Garden City, New York 11530
                                        Telephone: (212) 248-7431
                                        Fax: (212) 901-2107
                                        E-mail: MMesidor@tpglaws.com